1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11

12

13

14

15

16

| | |
|---|---|
| E.A.P.C., | Case No. 1:25-CV-01546-JLT-CDB |
| Petitioner, | ORDER CONVERTING THE MATTER TO A PRELIMINARY INJUNCTION[1] AND GRANTING THE PRELIMINARY INJUNCTION IN PART AND REFERRING THE MATTER TO THE ASSIGNED MAGISTRATE |
| v. | |
| MINGA WOFFORD et al., | |
| Respondents. | |
| | (Doc. 2) |

17

### I.    INTRODUCTION

18

    Before the Court for decision is E.A.P.C.'s ("Petitioner's") request for a temporary

19

restraining order, (Doc. 2), filed in conjunction with his petition for a writ of habeas corpus

20

brought under 28 U.S.C. § 2241 challenging his ongoing immigration detention (Doc. 1.) Having

21

evaluated the TRO request, Respondents' opposition, (Doc. 11) and Petitioner's reply (Doc. 13),

22

the Court converts the matter into a motion for preliminary injunction, **GRANTS** that motion **IN**

23

**PART**, and **REFERS** the matter to the assigned magistrate judge for a determination on the

24

merits.

25

### II.    FACTUAL & PROCEDURAL BACKGROUND

26

    Petitioner is a citizen and national of Venezuela who claims to have fled his home

27

28

---

[1] Upon agreement of the parties, the Court converts the motion for temporary restraining order into one for preliminary injunction. (Doc. 10 at 3, fn. 3; Doc. 11 at 15.) The parties have also affirmatively declined an evidentiary hearing. (*Id.*)

country after facing political persecution. (*See generally* Doc. 1-2.) He entered the United States on or about November 27, 2021, at which time he was apprehended by the Department of Homeland Security ("DHS") near Yuma, Arizona. (Doc. 1-2 at 2;[2] Doc. 10-1, ¶5.) Petitioner admitted to entering the United States unlawfully. (Doc. 10-1; ¶5.) After being held in a border detention facility for several days (Doc. 1-2 at 2), on or about December 1, 2021, Petitioner was released on an Order of Recognizance (Doc. 10-1; ¶6) and served with an I-220A Notice of Appearance (Doc. 10 at 7) pursuant to INA 212(a)(6)(A)(i) (8 U.S.C. §1182(a)(6)(A)(i)) as a noncitizen not admitted or paroled in the United States. In doing so, immigration officials necessarily determined that Petitioner did not present a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."). The I-220A form, which Petitioner signed upon his release, imposed various conditions, including reporting to a duty officer in San Francisco, California on December 15, 2021 (Doc. 10-1 at 7.) Petitioner's release was also contingent upon enrollment in an Alternatives to Detention ("ATD") program, which required him to wear an ankle monitor for three months. (Doc. 10-1 at 7; Doc. 1-2 at 2.)[3]

DHS enrolled Petitioner into the Intensive Supervision Alternative Program ("ISAP") (Doc. 10-1, ¶7.) Petitioner was also given a phone by DHS which he would use to report to immigration authorities (Doc. 1-2 at 3) and a monitoring application was installed on Petitioner's personal cell phone for purposes of weekly reporting to DHS. (*Id.*) Petitioner states that he

---

[2] The paragraph numbering on Petitioner's declaration (Doc. 1-2) begins with paragraphs one through seven and then reverts to paragraph one (*Id.* at 2.) Consequently, the Court will refer corresponding page number in Petitioner's declaration instead of paragraphs.

[3] E.A.P.C. also signed an addendum to his Order of Release on Recognizance (Doc. 10-1 at 9), which imposed the following additional requirements: (1) that he not associate with known gang members, criminal associates, or be associated with any such activity, (2) that he not commit any crimes while on this Order of Release on Recognizance, (3) that he provide ICE with written copies of requests to Embassies or Consulates regarding his request, (4) that he provide ICE with written responses from the Embassy or Consulate regarding his request, and (5) any violation of these conditions could result in in revocation of his employment authorization document or him being taken into ICE custody or him being criminally prosecuted. (*Id.*)

1    submitted late check-in photos to DHS on three occasions (*Id.*) Petitioner claims to have

2    communicated with DHS following these delays and stated that he never received any formal

3    warnings, threats of arrest, or formal notice of non-compliance from ISAP officials. (Doc. 1 at

4    13.)[4]

5    　　　　Respondents assert that Petitioner did not comply with his ISAP reporting requirements

6    on numerous occasions: August 4, 2025, (Missed Biometric Check-in); August 8, 2025 (Missed

7    Virtual Office Visit); August 11, 2025, (Missed Biometric Check-in); August 25, 2025 (Missed

8    Biometric Check-in); and October 6, 2025 (Missed Biometric Check-in). (Doc. 10-1; ¶8.)

9    Respondents also report that Petitioner was warned to comply with the conditions of release, but

10   they did not provide any documentation in support of this assertion. (*Id.*)

11   　　　　According to information relayed to the Court from Petitioner through counsel, after

12   entering the United States, he came to live first in San Jose, California, then Manteca, California,

13   and then Modesto, California, where he worked as a mechanic and food delivery driver for the

14   past two years. (Doc. 1-2 at 3.) Petitioner has a valid work permit, a clean criminal record and

15   pays taxes. (*Id.*)

16   　　　　Petitioner filed an asylum petition which is currently pending with the Executive Office

17   for Immigration Review ("EOIR"). (Doc. 1-2 at 3.) As a former member of the Venezuelan

18   Army, Petitioner claims he refused orders to fire on civilians and was then forced to flee the

19   country. (*Id.* at 4.) Petitioner claims that after his asylum application was transferred to

20   immigration court, he was served with a Notice to Appear ("NTA") pursuant to Section 240 of

21   the Immigration and Nationality Act ("INA"). (*Id.*) Prior to his detention, Petitioner originally

22   had a hearing scheduled for 2029 and now has a master calendar hearing on November 26, 2025.

23   (*Id.*)

24   　　　　On or about October 23, 2025, Petitioner reported to the Immigration and Customs

25

26   [4] In Petitioner's Petition for Habeas Corpus (Doc. 1), Petitioner claims he failed to timely submit his required photo
     check-ins on three separate occasions because he was asleep at the time of notifications. (*Id.* at 13.) Petitioner claims

27   he routinely worked 10-to-12-hour shifts and night shifts and reported sustained bouts of exhaustion. (*Id.*)
     Petitioner's counsel's declaration (Doc. 1-2) states that Petitioner recalled missing a phone check-in from ICE on or

28   around October 14, 2025, because he accidently left his phone in a car he was repairing and did not retrieve the
     phone until October 19, 2025. (Doc. 1-2 at 6-7.)

Enforcement Field ("ICE") Office in Stockton, California for a scheduled office visit, where he was arrested for violating the conditions of the ISAP program. (Doc. 1-2 at 6; Doc 11-1, ¶9). Later that evening, Petitioner was transferred from Stockton to the Mesa Verde ICE Processing Center in Bakersfield, California. (Doc. 1-2, ¶18; Doc 11-1, ¶9.)

On November 12, 2025, Petitioner filed a petition for writ of habeas corpus (Doc. 1) asserting that his detention is unlawful under the Immigration Nationality Act and violates his procedural and substantive due process rights under the Fifth Amendment. (Doc. 2.) He also filed a motion for a temporary restraining order requesting immediate release and other injunctive relief (*Id*) and a motion to proceed via pseudonym (Doc. 3.) At the time of filing, Petitioner's next scheduled immigration hearing was set for November 26, 2025. (Doc. 1-2 at ¶6.)

The government opposes the issuance of preliminary injunctive relief and maintains that Petitioner's detention is "mandatory" under expedited removal procedures set forth at 8 U.S.C. § 1225(b)(2). (*See generally* Doc. 10.)

## III.    LEGAL BACKGROUND

### A.    Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)

Two statutes govern the detention and removal of inadmissible noncitizens from the United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v. Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

> ### A.    <u>Full Removal Proceedings and Discretionary Detention (§ 1226)</u>
>
> The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial

custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or his release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

## B. Expedited Removal and Mandatory Detention (§ 1225)

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1)

allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order

the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

## C. The Government's Recent Change in Position

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)) . . .

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited

removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025).

Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

**B.    Parole Revocation**

In *Y-Z-H-L v. Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025), the court

explained the parole process in immigration cases and noted that before parole may be revoked,

the parolee must be given written notice of the impending revocation, which must include a

cogent description of the reasons supporting the revocation decision. The court held:

> Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:
>
>> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions asShe may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from whichShe was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.**
>
> 8 U.S.C. § 1182(d)(5)(A).

*Y-Z-H-L v. Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under

8

the Administrative Procedure Act, immigration parolees are entitled to determinations related to

their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at \*10. An

agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the

agency fails to "articulate[] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Id*. Parole revocations in the context

of the INA must occur on a case-by-case basis and may occur "when the purposes of such parole

shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall

forthwith return or be returned to the custody from which he was paroled." *Id*. at \*12 (quoting 8

C.F.R. § 212.5(e)). 8 C.F.R. § 212.5(e) requires written notice of the termination of parole

except where the immigrant has departed or when the specified period of parole has expired.

Applying *Y-Z-H-L* and § 212.5(e), *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV,

2025 WL 1953796, at \*11 (W.D.N.Y. July 16, 2025), found that the INA requires a case-by-case

analysis as to the decision to revoke humanitarian parole:

> This Court agrees that both common sense and the words of the
> statute require parole revocation to be analyzed on a case-by-case
> basis and that a decision to revoke parole "must attend to the reasons
> an individual [noncitizen] received parole." *See id*. There is no
> indication in the record that the government conducted any such
> analysis here. On the contrary, the letter Mata Velasquez received
> merely stated summarily that DHS had "revoked [his] parole."
> Docket Item 62-1 at 5. Thus, there is no indication that—as required
> by the statute and regulations—an official with authority made a
> determination specific to Mata Velasquez that either "the purpose
> for which [his] parole was authorized" has been "accomplish[ed]"
> or that "neither humanitarian reasons nor public benefit warrants
> [his] continued presence...in the United States." *See* 8 C.F.R.
> § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's
> parole violated his rights under the statute and regulations. *See Y-Z-
> L-H*, 2025 WL 1898025, at \*13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at \*3 (N.D.

Cal. July 24, 2025), the court reached a similar conclusion relying on the Due Process Clause:

> . . . **even when ICE has the initial discretion to detain or release
> a noncitizen pending removal proceedings, after that individual
> is released from custody she has a protected liberty interest in
> remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508,
> 2022 WL 1443250, at \*2 (N.D. Cal. May 6, 2022) ("[T]his Court
> joins other courts of this district facing facts similar to the present
> case and finds Petitioner raised serious questions going to the merits

1    of his claim that due process requires a hearing before an IJ prior to
     re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021
2    WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v.
     Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal.
3    Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on
     preparole, parole, and probation status have a liberty interest, so too
4    does [a noncitizen released from immigration detention] have a
     liberty interest in remaining out of custody on bond.").

5

6    *Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*,

7    No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also*

8    *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The

9    Supreme Court has consistently held that non-punitive detention violates the Constitution unless

10   it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a

11   neutral decisionmaker to ensure that the imprisonment serves the government's legitimate

12   goals.").

13                              **IV.    ANALYSIS**

14   **A.    Jurisdiction**

15        1.    Habeas Corpus

16        Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of

17   habeas corpus in which the petitioner asserts he is being held in custody "in violation of the

18   Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack

19   by a person in custody upon the legality of that custody, and that the traditional function of the

20   writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

21   Petitioner seeks his immediate release from custody, which he contends violates the Constitution

22   of the United States. (*See* Doc. 1.) Thus, he properly invokes the Court's habeas jurisdiction.

23        2.    Judicial Review under the INA

24        The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g) precludes

25   this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

26   adjudicate cases, or execute removal orders against any alien," there is no removal order at issue

27   here and the central issue is Petitioner's continued detention. Thus, this Court has the authority

28   to review the termination of Petitioner's release. *See Jennings v. Rodriguez*, 583 U.S. 281, 294

1  (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically

2  outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525

3  U.S. 471, 482 (1999).

4  **B.     Preliminary Injunction**

5            The standard for issuing a TRO is the same as the standard for issuing a preliminary

6  injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th

7  Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary

8  injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1)

9  they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable

10  harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their]

11  favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555

12  U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of

13  the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632

14  F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion."

15  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir.

16  2023). The Court may weigh the request for a preliminary injunction with a sliding-scale

17  approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of

18  hardships may support the issuance of a preliminary injunction where there are "serious

19  questions on the merits … so long as the plaintiff also shows that there is a likelihood of

20  irreparable injury and that the injunction is in the public interest." *Id.* "A preliminary injunction

21  is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary

22  injunctions are intended to "merely to preserve the relative positions of the parties until a trial on

23  the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v.*

24  *Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

25            The status quo refers to "the last uncontested status which preceded the pending

26  controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (quoting

27  *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)). In the

28  Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-

CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).

Even if the Court's action here constitutes a mandatory injunction,[5] the evidence supports that action Petitioner alleges she has suffered and is suffering violations of his substantive and procedural due process rights and that his continued unlawful detention will impose on him serious injury if the injunction is not issued. The injunction issued here is on firm legal footing and the result does not appear to be doubtful either; due process clearly requires that Petitioner be given a hearing before his bond is revoked. These injuries are not capable of redress through monetary compensation. Accordingly, injunctive relief is appropriate even under the higher standard for mandatory injunctions.

       1.    <u>Likelihood of Success on the Merits</u>

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). Petitioner contends that his re-detention and continued detainment violates both substantive and procedural due process. (*See generally* Doc. 1 at 17-29.)

       a.    *Respondents Rely on an Incorrect Interpretation of § 1225 for the Authority to Detain Respondent*

Respondents maintain Petitioner's detention is "mandatory" under 1225(b) while his removal proceedings are pending. (Doc. 10 at 5-6.) The various legal arguments relied upon by DHS to support this assertion have been rejected by this Court in other proceedings. *See, e.g.*, *Ortiz Donis v. Chestnut*, 1:25-CV-01228-JLT, 2025 WL 2879514 at *3–6 (E.D. Cal. Oct. 9, 2025); *M.R.R. v. Chestnut*, No. 1:25-CV-01517-JLT, 2025 WL 3265446 (E.D. Cal. Nov. 24,

---

[5] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id.* (internal citations and quotation marks omitted).

1    2025).

2         The Court acknowledges that two recent decisions in this district accepted Respondents'

3    new interpretation of § 1225(b)(2), finding that individuals who had been living in the United

4    States for nearly 30 years remained noncitizen, "applicants for admission" under § 1225(b)(2)

5    and therefore subject to mandatory detention without a pre-deprivation hearing. *Valencia v.*

6    *Chestnut*, --- F. Supp. 3d ---, 2025 WL 3205133 (E.D. Cal. Nov. 17, 2025); *Cortes Alonzo v.*

7    *Noem*, --- F. Supp. 3d ---, 2025 WL 3208284 (E.D. Cal. Nov. 17, 2025). However, unlike

8    E.A.P.C., the petitioners in *Valencia* and *Alonzo* had <u>never</u> been encountered, let alone

9    processed, by immigration officials, and had not been released on recognizance pending

10   completion of Section 240 removal proceedings. (*See Valencia v. Chestnut*, Case No. 1:25-cv-

11   01550-WBS-JDP, Doc. 8 at 2; *See Cortes Alonzo v. Noem;* 1:25-cv-01519-WBS-SCR, Doc. 11

12   at 5.) Even assuming, *arguendo*, that Respondents' new interpretation of § 1225(b)(2) is the

13   better textual reading of the applicable statutes and thus may be applied to applicants for

14   admission going forward, Respondents argue here for the retroactive application of their new

15   interpretation to Petitioner (and many others like him), even though the government previously,

16   affirmatively placed him into Section 240 proceedings—a system that affords non-citizens much

17   greater procedural protections than to those placed in expedited removal. *See Mata Velasquez v.*

18   *Kurzdorfer*, No. 25-CV-493-LJV, 2025 WL 1953796, at *9 (W.D.N.Y. July 16, 2025)("Because

19   DHS chose to place Mata Velasquez in section 240 proceedings instead of pursuing expedited

20   removal in the first instance—even though it was not required to do that—the government vested

21   Mata Velasquez with the rights that Congress guaranteed non-citizens in those proceedings.").

22   E.A.P.C.'s situation is not comparable to Valencia's, which may explain the lackluster due

23   process arguments presented in that case. *See Valencia*, 2025 WL 3205133, at *4.

24        Thus, because petitioner has been present in the United States for approximately four

25   years and was released on his own recognizance by ICE before Respondents adopted the new

26   interpretation of the governing statutes, the Court concludes that the government's recent

27   interpretation of the relationship between § 1225 and § 1226, even assuming it is correct—

28   though the Court is unconvinced that it is—does not apply here such that detention is not

1    "mandatory" in this case.

2             b.     *Due Process Protections*

3       Petitioner contends that his continued detention violates his due process rights. (*See* Doc.

4    2 at 12-17.) In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL

5    2084921, at *3 (N.D. Cal. July 24, 2025), the court held,

> 6           . . . **even when ICE has the initial discretion to detain or release
> 7       a noncitizen pending removal proceedings, after that individual
>        is released from custody she has a protected liberty interest in
> 8       remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508,
>        2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court
> 9       joins other courts of this district facing facts similar to the present
>        case and finds Petitioner raised serious questions going to the merits
> 10     of his claim that due process requires a hearing before an IJ prior to
>        re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021
> 11     WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v.
>        Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal.
> 12     Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on
>        preparole, parole, and probation status have a liberty interest, so too
> 13     does [a noncitizen released from immigration detention] have a
>        liberty interest in remaining out of custody on bond.").

14   *Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*,

15   No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also*

16   *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The

17   Supreme Court has consistently held that non-punitive detention violates the Constitution unless

18   it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a

19   neutral decisionmaker to ensure that the imprisonment serves the government's legitimate

20   goals.").[6]

21

22   ---

[6] Respondents rely on *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) and its progeny for their argument that the Fifth Amendment does not apply to Petitioner. (Doc. 10 at 5) For example, they argue:

> 23      "[A]liens who arrive at ports of entry even those paroled elsewhere in the country for years
>        pending removal are treated for due process purposes as if stopped at the border." *Dep't of*
> 24    *Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *Shaughnessy v. United*
>        *States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). This means that applicants for admission do not
> 25    enjoy the same set of procedural and substantive due process protections afforded to individuals
>        lawfully in the United States; indeed, applicants for admission have virtually no constitutional
> 26    rights regarding their applications. *Valencia v. Mukasey*, 548 F.3d 1261, 1263 (9th Cir.
>        2008) (quoting *Landon v. Plasencia*, 459 U.S. 21, 33 34 (1982)). In other words, the only inquiry
> 27    when an applicant for admission raises a due process claim is "whether the government violated
>        the statutory rights that Congress afforded such applicants. *Grigoryan v. Barr*, 959 F.3d 1233,
> 28    1241 (9th Cir. 2020) (citing *Angov v. Lynch*, 788 F.3d 893, 898 99 (9th Cir. 2015).

1    Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for

2    all "applicants for admission," Respondents fail to contend with the liberty interest created by

3    the fact that the Petitioner in this case was released on recognizance in November 2021, *prior to*

4    *the manifestation of this interpretation*.

5         Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424

6    U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been

7    applied to Petitioner are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL

8    2084921at *3.[7] In *Mathews*, the Court determined the following:

9              [O]ur prior decisions indicate that identification of the specific
              dictates of due process generally requires consideration of three
10             distinct factors: First, the private interest that will be affected by the
              official action; second, the risk of an erroneous deprivation of such
11             interest through the procedures used, and the probable value, if any,
              of additional or substitute procedural safeguards; and finally, the
12             Government's interest, including the function involved and the
              fiscal and administrative burdens that the additional or substitute
13             procedural requirement would entail.

14        As to private interest, during his approximately four years on parole, Petitioner pursued

15   gainful employment, built relationships with many in his community, and kept a clean criminal

16   record. Thus, parole allowed his to build a life outside detention, albeit under the terms of that

17   parole. Petitioner has a substantial private interest in being out of custody and his detention

18   denies his that liberty interest. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from

19   imprisonment—from government custody, detention, or other forms of physical restraint—lies at

20   the heart of the liberty that [the Due Process] Clause protects.").

21

22   _____

23   (Doc. 10 at 5.) However, as one thorough decision recently issued in the District of Arizona explained,
     *Thuraissigiam* and its progeny are distinguishable:

24        In *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not
         have any due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S.
25        at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding
         [petitioner's] admissibility into the United States, but instead involves a challenge to his detention
26        pending the conclusion of his removal proceedings.

27   *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *15 (D. Ariz. Aug. 11, 2025),
     *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB),
28   2025 WL 2349133 (D. Ariz. Aug. 13, 2025).

1    The Court finds there is at least some risk of erroneous deprivation under the present

2    circumstances, with the record suggesting several reasons why Petitioner's detention may not be

3    justified. First, in 2021, in releasing him on parole, DHS necessarily concluded that Petitioner

4    was not a flight risk or danger to the community. *Noori v. LaRose, et al.,* 2025 WL 2800149, at

5    13* (S.D. Cal. Oct. 1, 2025) (In general, '[r]elease reflects a determination by the government

6    that the noncitizen is not a danger to the community or a flight risk.'" *Saravia v. Sessions,* 280 F.

7    Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions,* 905 F.3d

8    1137 (9th Cir. 2018)."

9    This record also shows that Petitioner may have violated the terms of his release,

10    including missing both biometric check-ins and virtual office visits. (Doc. 10-1, ¶8.) Even still,

11    the remaining question is whether these missed biometric check-ins constitute changed

12    circumstances sufficient to convince an IJ that detention is required. The Supreme Court has held

13    that "the Constitution requires some kind of a hearing *before* the State deprives a person of

14    liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original).

15    However, the Court also recognized that there may be situations that urgently require arrest, in

16    which a prompt post-deprivation hearing is appropriate. *Id.* at 128 (noting there may be "special

17    case[s]" where a pre-deprivation hearing is impracticable); *Guillermo M. R. v. Kaiser*, No. 25-

18    CV-05436-RFL, 2025 WL 1983677, at *9 (N.D. Cal. July 17, 2025) ("absent evidence of urgent

19    concerns, a *pre*-deprivation hearing is required to satisfy due process, particularly where an

20    individual has been released on bond by an IJ"). The rapidly developing caselaw on this subject

21    gives limited guidance as to where this line should be drawn. Some courts that have addressed

22    detention-related habeas petitions brought by persons released with enhanced supervision

23    conditions have required pre-deprivation process, but in somewhat different circumstances. In

24    *E.A.T.-B. v. Wamsley*, No. C25-1192-KKE, 2025 WL 2402130, at *4 (W.D. Wash. Aug. 19,

25    2025), the district court ordered the release of a petitioner arrested by ICE immediately after

26    appearing in immigration court. That court agreed with the petitioner that ICE's post hoc

27    explanation that violations warranted his detention was pretextual, given that ICE first became

28    aware of petitioner's alleged violations a few hours before his immigration hearing, DHS did not

16

1  raise those violations at the hearing or argue the petitioner should be detained for any reason, and

2  the petitioner was then provided multiple, inconsistent justifications for his arrest. *Id*. In *Arzate*

3  *v. Andrews*, No. 1:25-CV-00942-KES-SKO (HC), 2025 WL 2230521, at *7 (E.D. Cal. Aug. 4,

4  2025), converted to preliminary injunction sub nom, 2025 WL 2411010, at *1 (E.D. Cal. Aug.

5  20, 2025), the court ordered immediate release of in immigration detainee who had been in

6  compliance with his conditions of release, even though he had incurred a misdemeanor arrest

7  while on parole, in part because no charges were ever filed.

8      In contrast, this Court ordered a parole revocation hearing in *Martinez Hernandez v.*

9  *Andrews*, No. 1:25-CV-01035 JLT HBK, 2025 WL 2495767 (E.D. Cal. Aug. 28, 2025), where

10  the petitioner's records indicated numerous violations. Though Martinez Hernandez offered

11  explanations for the violations and there was a dispute of fact as to whether the violations

12  occurred, ICE's reliance upon those violations was "not obviously pretexual." *Id*. at * 12 ("If

13  Respondent's view of the facts is correct, it is at least arguable that providing Petitioner with

14  notice and a pre-deprivation hearing would have been impracticable and/or would have

15  motivated his flight."). As this Court noted in *Martinez Hernandez*:

16
17
18
19
20
21
22

> In similar circumstances, courts have refused to release the petitioners but have ordered timely bond hearings. *Carballo v. Andrews*, No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *8 (E.D. Cal. Aug. 15, 2025), citing *Perera v. Jennings*, et. al, No. 21-CV-04136-BLF, 2021 WL 2400981, at *5 (N.D. Cal. June 11, 2021); *Pham v. Becerra*, No. 23-CV-01288-CRB, 2023 WL 2744397, at *6 (N.D. Cal. Mar. 31, 2023). "[A]llowing a neutral arbiter to review the facts would significantly reduce the risk of erroneous deprivation." *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *8 (N.D. Cal. July 17, 2025). Thus, the Court concludes that prompt, post-deprivation process is required here.

23  *Id*. Finally, as other courts have done, this Court concludes that the government's interest in

24  detaining Petitioner without proper process is slight. In sum, the Court concludes that he has

25  demonstrated a likelihood of success on the merits on his procedural due process claim.

26      **C.  Irreparable Harm**

27      "It is well established that the deprivation of constitutional rights 'unquestionably

28  constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

1  *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized

2  'irreparable harms imposed on anyone subject to immigration detention' including 'the

3  economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez*

4  *v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970

5  (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm).

6  The Petitioner has established irreparable harm.

7  **D. Balance of the Harms/Public Interest**

8  Because the interest of the government is the interest of the public, the final two factors

9  merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

10  The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of his liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).
>
> This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed his motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to his situation. his liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain his without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

1

2   *Pinchi*, at *3. In addition, there appears to be no dispute that there is no evidence that Petitioner

3   poses a risk of flight or a danger to the community. For these reasons and those set forth in

4   *Pinchi*, the Court concludes that the equities and public interest weigh in favor of Petitioner.

5        **E.  Bond**

6        "The court may issue a preliminary injunction or a temporary restraining order only if the

7   movant gives security in an amount that the court considers proper to pay the costs and damages

8   sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.

9   65(c). The Court has "discretion as to the amount of security required, if any," and it "may

10  dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the

11  defendant from enjoining his or his conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir.

12  2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed

13  in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753

14  F.2d at 727, the Court finds that no security is required here.

15       **F.     Burden of Proof**

16       Petitioner requests that the Court order Petitioner released from custody and bar

17  Respondents from rearresting him in a subsequent action without a hearing before a neutral

18  adjudicator. (*See* Doc. 2 at 22.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the

19  Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal

20  proceedings had a right to a second bond hearing where the government would have the burden

21  to establish by clear and convincing evidence that his continued detention was justified.

22  *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

23          Nothing in this record suggests that placing the burden of proof on
            the government was constitutionally necessary to minimize the risk
24          of error, much less that such burden shifting would be
            constitutionally necessary in all, most, or many cases. There is no
25          reason to believe that, as a general proposition, the government will
            invariably have more evidence than the alien on most issues bearing
26          on alleged lack of future dangerousness or flight risk.

27  *Id*. at 1212. However, *Rodriguez Diaz* "held only that a noncitizen detained under section

28

1  1226(a) does not have a right to a second bond hearing when the only changed material

2  condition since their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL

3  2084921, at *4. It did not address the burden of proof applicable under the present

4  circumstances.

5  *Pinchi* went on to discuss why the calculus changes for an individual who had been

6  paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing
> provided under section 1226(a) provides constitutionally sufficient
> process for those noncitizens who have never previously been
> detained and released by DHS, [Petitioner's] circumstance is
> different. his release from ICE custody after his initial
> apprehension reflected a determination by the government that she
> was neither a flight risk nor a danger to the community, and [she]
> has a strong interest in remaining at liberty unless she no longer
> meets those criteria. The regulations authorizing ICE to release a
> noncitizen from custody require that the noncitizen "demonstrate
> to the satisfaction of the officer that such release would not pose a
> danger to property or persons" and that the noncitizen is "likely to
> appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
>
> Release [therefore] reflects a determination by the government that
> the noncitizen is not a danger to the community or a flight risk."
> *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017),
> aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th
> Cir. 2018). [Petitioner] was apprehended by ICE officers when she
> crossed the border into the United States [ ]. ICE then released his
> on his own recognizance. As ICE was not authorized to release
> [her] if she was a danger to the community or a flight risk, the
> Court must infer from [her] release that ICE determined she was
> neither. [Her] release from ICE custody constituted an "implied
> promise" that his liberty would not be revoked unless she "failed
> to live up to the conditions of his release." *Morrissey*, 408 U.S. at
> 482. The regulatory framework makes clear that those conditions
> were that she remain neither a danger to the community nor a
> flight risk. [She] justifiably relied on the government's implied
> promise in obtaining employment, taking on financial
> responsibility for his family members, and developing community
> relationships. The more than two years that she has spent out of
> custody since ICE initially released his have only heightened his
> liberty interest in remaining out of detention. Accordingly, [her]
> private interest in retaining his liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4.

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was

required under *Mathews*. The Court in *Pinchi* also placed the burden at any such hearing on the

20

1  government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-

2  detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical

3  even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the

4  immigrant's initial release reflected a determination by the government that the noncitizen is not

5  a danger to the community or a flight risk. Since it is the government that initiated re-detention,

6  it follows that the government should be required to bear the burden of providing a justification

7  for the re-detention.

8  **V.      CONCLUSION AND ORDER**

9      1.      Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a

10  Motion for Preliminary Injunction, and it is **GRANTED in PART**.

11      2.      Petitioner **SHALL** be provided a *substantive* parole revocation hearing **no later**

12  **than December 9, 2025,** at which the Immigration Judge will determine whether Petitioner

13  poses a risk of flight or a danger to the community if he is released.

14      3.      At any such hearing, the Government **SHALL** bear the burden of establishing, by

15  clear and convincing evidence, that Petitioner poses a danger to the community or a risk of

16  flight, and Petitioner **SHALL** be allowed to have counsel present.

17      4.      The government may file a further brief on the merits of the habeas petition

18  within 45 days. Alternatively, as soon as it can within that 30-day period, the government may

19  file a notice that it does not intend to file further briefing. If the government files an additional

20  brief, Petitioner may file a further brief within 30 days thereafter.

21  ///

22  ///

23  ///

24      5.      The matter is referred to the assigned magistrate judge for consideration of the

25  merits of the petition as quickly as possible.

26

27  IT IS SO ORDERED.

28      Dated:   **November 25, 2025**

UNITED STATES DISTRICT JUDGE